# *forensic mental health associates*

RICHARD M. HAMILL, Ph.D. DIRECTOR

437 WESTERN AVENUE • ALBANY, N.Y. 12203 • (518) 489-7971 • FAX (518) 489-0012

## SPECIALIZED PSYCHOLOGICAL EVALUATION

Name:                KARPER, David R. Jr.
Date of Birth:       ▉▉▉▉ 1981
Age:                 30
Date of Evaluation:  11/01/2011 and 11/08/2011
Evaluated By:        Richard M. Hamill, Ph.D.

*Reason for Referral:*

David Karper was referred for a psychological evaluation by US Probation Officer Dan Casullo, to come to a better understanding of Mr. Karper's offense, particularly in regard to any recommendations for appropriate treatment, and risk of recidivism. Mr. Karper is under pre-sentence supervision by the United States Probation Office and is required to submit to this evaluation and treatment, if indicated.

*Methodology of Evaluation:*

The psychological evaluation of David Karper was conducted in a manner consistent with the *Practice Standards and Guidelines for the Evaluation, Treatment and Management of Adult Male Sexual Abusers* (the Association for the Treatment of Sexual Abusers, 2005). Specifically, the evaluation included the following components: a review of background documentation, an individual interview of Mr. Karper, the administration of a battery of self-report and actuarial psychological tests, and the use of a viewing time measure designed to examine the nature of the client's sexual interests. The administration of a Psychophysiological Detection of Deception (polygraph) examination was deemed to be unnecessary to this evaluation.

The following documents were provided to evaluators and considered as one component of the evaluation process:

- three page letter from USPO Dan Casullo, dated 10/31/2011
- four page Order Setting Conditions of Release, dated 3/17/2011

*Clinical Interview with David Karper*

David Karper presented as an irritated and argumentative young man. He opened the discussion with a tirade about how he has been wrongly convicted (despite his having been in possession of

Exhibit C

child pornography), in light of his having been conducting an investigation. He characterized the federal law enforcement authorities as "pedophiles," and as being lazy, which thereby triggered his having to conduct his own investigation about whether his daughter was being sexually abused. He acknowledged that he surrendered all his parental rights to his daughter when she was two months old, approximately 9 years ago. He has not seen, nor had contact from her since then. He agreed to participate in the interview, despite his great irritation and reluctance.

David Karper is currently residing with his parents, David and Debra Karper. Also living in the home is his 21 year old sister, Shauna. He is single and has one biological child, a 9 year old daughter named Kimberly. Mr. Karper said that he believes she lives in Nevada. He surrendered his parental rights, noting that he last saw her when she was 2 months old.

Asked about employment, David Karper reported that he is not currently employed. His last job was as a boiler technician for J. W. Stevens (Blake Industrial) in 2005 to 2007, and then again in 2009 to 2010. He said he was laid off due to lack of available work. Now that he has been arrested, he believes they will not hire him back.

With regard to his legal issues, he said a search was conducted on 11/11/2010, resulting in the seizure of his computer. He recalled, "They found me doing my own investigation that they got in the middle of it." He admitted that he had child pornography, and pled guilty in September. His sentencing is scheduled for January 2012.

David Karper said he doesn't know how many child pornography images he had on his computer. His explanation of how he became a suspect does not make sense (in that he cited "spyware" planted on his computer by the government). He used Limewire, and employed search words like "9 year olds", "8 year olds", "7", "6", and "mommyandme" in order to gather child pornography. He also said that his daughter's grandmother emailed him a picture of his daughter when she was 7 or 8 years old.

Mr. Karper reported that he had only one prior arrest. He said, at age 16, he was charged with Burglary in the Third Degree. He reported that he and his friend took a motorbike from an abandoned barn. He recalled that his father told him he had to return the bike, and they got caught as they were attempting to return it to the barn. To the question, "Did you do anything wrong," Mr. Karper replied, "We cleaned it up and tried to get it running." Asked the same question a second time, he responded, "We grabbed an abandoned bike – we got in trouble for returning a bike that we grabbed." He was sentenced to one year of Probation supervision for this offense. In addition to his current offense and this charge for Burglary III, he reported that he was charged with Driving with a Suspended License. He explained that he was pulled over and then discovered that his license was suspended. David Karper denied any additional legal issues.

Regarding health matters, David Karper reported that he has no medical problems and is not prescribed any medications. He also denied receiving any past mental health treatment.

To an inquiry about his assertion that he had been "conducting an investigation," he provided the following explanation of his behavior. In 2007, he recalled that he received an email from his ex-girlfriend's mother, with a link to a page which he couldn't load. Then she sent him something else last year saying, "She's been up to her old tricks - check your Limewire." He said the 2007 link was for a naked picture of his daughter or pictures of her with males. In 2007, it was alleged that the mother and his daughter had posted pictures of themselves undressing.

Asked, "Did you do anything wrong here," Mr. Karper replied, "Just Possession and doing police work – the only thing I'm guilty of is doing my own investigation." Asked again, "Did you do anything wrong?", he answered, "No." David Karper went on to explain that he looked for images of his daughter "off and on for 7 or 8 months, June (when he was laid off) to October". He thought he looked at "7 or maybe 8 pictures". He stated, "From what I was told, there's more than that, but I've only seen 7 or 8." With regard to the federal agents conducting the investigation, he shared, "What are they, frigging pedophiles?" He said, "I wasn't looking at the pictures – I was looking at the face." In response to the federal agents providing detailed descriptions of some of the pictures they found on his computer, Mr. Karper exclaimed, "It's bad enough you can't trust the police, but to think they're pedophiles...." He explained, "I was looking for a strawberry blonde little girl." He said that he saw a picture of his daughter in late 2009 - a Christmas picture. He was hoping to recognize her on the Internet, in child pornography images, because "then I'd have sufficient information to go to the police and get them to stop that crap". He acknowledged that he also saw part of one video, which he had to download first.

In his defense, Mr. Karper said, "because they (FBI) are allowed to do it (search for child pornography) and you're not". He shared, "Why, I'm human, they're human," and, "I get to search for my blood, yes." He explained, "It has nothing to do with them – it's all family."

*Personal and Psychosexual History*

Thirty year old David Karper reported that he has lived in Cobleskill, New York, for the last 20 years. Prior to that his family resided in Ohio, Connecticut, and then Ballston Spa, Halfmoon, and Clifton Park, New York. He is the oldest of three children born to Deborah (age 46) and David Karper (age 54), Sr.. He said his parents have been married for 31 years and seem to "get along fine". He noted that they are "always there for each other," and denied that he has even witnessed any signs of domestic violence, "just bickering".

Regarding his mother, Mr. Karper said right now she is "annoyed with arthritis". He described her as being "family oriented", recalling that she was at home when he was growing up. According to David Kramer, with regard to the offense and arrest, his mother thinks "it's a pile of joke - just like me", implying that they share this opinion about his legal issues. Mr. Karper reported, "I live with my parents - since 2003." He said he had lived in Chicago and Corning prior to moving back to his parents' home.

Page -4-                    David R. Karper Jr. evaluation

Mr. Karper said his father is employed as a boiler technician. Asked to characterize his father, David Karper said he is "same as Mom - fun to be around, family based". He shared that his father "thinks it's (the case) a waste of time". Mr. Karper said he and his parents all get along fine.

David Karper has a younger brother, Keith (age 26) and a younger sister, Shauna (age 21). Shauna resides with Mr. Karper and his parents. Keith lives in Montgomery County. He said they all get along fine. As a child, he recalled that he was never assigned chores, but there was always stuff to do, such as firewood, lawns, and pets. He said typical discipline was being denied privileges like television, or use of the 4-wheeler. He denied ever experiencing or witnessing any physical, sexual or emotional abuse or neglect.

To a question about his family medical history, Mr. Karper denied anyone having mental or emotional problems. He noted that his aunt suffers from epilepsy and his mother has arthritis, but they are the only family members experiencing medical issues. He reported that one of his maternal uncles has some issues with alcohol abuse. Of himself, he shared, "I drink, but may have one or two." He also recalled that he used marijuana "here and there" when he was in high school. David Karper said he currently has a cold, but overall is healthy. Aside from an uncle who was charged with DWI, he is the only family member who has had legal issues. He spoke again about the incident in which he and a friend were caught trying to return a motorcycle they had previously stolen. That occurred in 1997, and Mr. Karper was 15 years old at the time. He served a term of one year on Probation.

With regard to his educational history, David Karper said he had been in preschool while living in Ohio. He attended kindergarten through 1st grade at Malta Avenue School in Ballston Spa. He said school was fine, but he was required to repeat 1st grade twice. He recalled that he had friends, but "was picked on by them - but as friends". He transferred to Tasago School in the Shenedehowa School System in Clifton Park, NY, where he was enrolled in 1st through 3rd grade. He said that he "hated that school" and that, "the Principal was a dick - he swung a curtain rod at me - I ducked and I was hit in the nose with an elbow." According to David Karper, the incident was never reported. Despite this, he said, "School was fine." He noted that there was "political bullshit - I didn't do homework - didn't need it". He then transferred to the Cobleskill School system, where he was from 4th grade through graduation. He recalled that he attended school at the Acre School for 4th and 5th grade, and then Radez School for 6th grade. He reported that he was expelled because he wouldn't do the homework. He shared, "They wanted to put me in the resource room." He was home schooled for 7th and 8th grades, and then took a test to get into high school. He attended Golden School for 9th grade and three months of 10th grade, before being suspended from school for the remainder of the year. He explained that he was suspended because he was caught with two "joints" (marijuana) on the school bus. He was again home schooled, by his mother and aunt, for 6 or 7 months. He attended Cobleskill/Richmondville High School for 10th through 12th grades. He recalled, "They wanted to put me in the 'retard class' -- I was annoyed." He reported that he engaged in VO Tech, taking courses on small engine repair, and woodworking, at first, and then construction trades, automotive skills, and math.

Asked about any disciplinary problems in school, Mr. Karper said he was suspended for a week for an argument with another student. He also was reminded of the incident with the "joints". David Karper stated, "I don't like to back down if I know I'm right - I will yell right back." Apparently, he discovered that this was viewed as insubordination. He recalled, "(They) made me see a counselor in Cobleskill (during 4 or 5th grade) -- it didn't work to their advantage." He remembered that he had been prescribed Ritalin when he was younger, but reported that he "got rid of it" because it "made me dumbfounded". David Karper said that he graduated from Cobleskill High School in 2001.

Following his graduation from high school, Mr. Karper enrolled in courses at Universal Technical Institute in Illinois, where he studied automotive, diesel, and auto body repair. He was there for 1 ½ years, but left because he "couldn't stand living in the city". Additionally, he reported that his ex-girlfriend's father shot him in the leg, and that he almost got run over while living at school. Subsequently, he enrolled in courses at Corning Community College, where he again studied automotive repair, and also small business. He shared, "Work was easy – school didn't like me - got yelled at cause I was teaching kids the right way. (Mr. Karper's emphasis)"

Asked when he first moved out of his parents' home, David Karper said he was 20 years old and he attended school in Chicago, Illinois. He said he "came back, got a summer job, then 'screwed up' and went back to school at Corning Community".

Questioned about a number of behaviors that are sometimes associated with conduct disorders, David Karper acknowledged engaging in several. He recalled getting in physical fights "once in a while," noting that the last such occurrence was in 5th grade. He admitted to being truant in school and also being disobedient. He denied bullying or threatening, stating that what he did do was "mostly horsing around with friends". He recalled shoplifting when he was younger - around 6 or 9 years of age. He was arrested for stealing a motorcycle at age 16. He and his friends engaged in fire-setting, but he said they were camping, so he may have been referring to the camp fire. He recalled that he tore up his lawn while using a 4 wheeler. Mr. Karper said he began using alcohol and marijuana when he was about 18 years old, and he tried crack once around age 25, because his "ex-girlfriend talked me into it".

David Karper reported that he does not have a job at present - not since his arrest in November 2010. He was last employed at the same place as his father works. He said he was a boiler technician, noting that he "couldn't stand the office manager", alleging that the office manager called him a "two-faced little prick". According to Mr. Karper, he was laid off in June due to lack of work. Prior to that he had worked at the Cooperstown Motel, working in maintenance and housekeeping. He said he was fired when he couldn't get there one day when they needed his help. He was employed also at a salvage yard, reportedly as an automotive technician. He also worked as a metal fabricator at American Standard, and previously, at Price Chopper, doing farm work, and as an apprentice boiler maker. All of these positions lasted two years or less.

Mr. Karper is single and has never been married. He has one child, 9 year old Kimberly Elizabeth. Her mother is Jessica. (Mr. Karper did not know her last name). He stated, "(I) haven't paid attention since we broke up - never lived together -- (I) tried to get involved, but her father (Jessica's) hated me." He said the father drove from New York to Chicago, and shot him in the leg with a pistol. He admitted that he hasn't seen his daughter since she was 2 months old and does not pay child support. He claimed that he tried to provide child support, "but they sent it back". According to David Karper, "The grandmother liked me - (she) offered me a job."

Asked about his significant other, David Karper denied currently being in a relationship. He said the last person he dated was Charlene (either Merwin or Papras - he wasn't sure). He said they started seeing each other in February of 2011, but at the "end of September, she pissed me off and I told her to leave." He said they did not live together, but they shared a sexual relationship. A little later in the interview, Mr. Karper said Charlene was 37 or 38 years old, and he was 29. He said she has children, noting that the youngest child lived with her. He did not say how many children she had, or where the others resided. Mr. Karper said he hasn't seen Charlene since mid-March, noting that "(They) put me on house arrest - in April she moved to South Carolina."

Next David Karper discussed significant past relationships. First, he mentioned Jessica, noting "I was 20, she was four months younger." They were together for eight or nine months. He reported that she stayed in Illinois. He said, "I moved," and, "(Her) father would cut her off if she moved." He recalled that they were together for about six months when she became pregnant. He said she had been pregnant before, but miscarried. They did not live together. Last year, he dated Jamie for two or three months "'til her cousin lied to her". He explained, "He told her I was cheating on her." Jamie was 20 years old (Mr. Karper was about 29). He reported that the relationship was sexual, but they did not live together. Prior to that, when "I was 28, she was 26," he dated Melissa. He said they were together for four months (by his count) and lived together for eleven months.

Asked for more information about his psychosexual history, David Karper estimated that he has had six sexual partners, all of whom were in the context of a relationship. He said he first learned about sex by "doing it". He was 12 years old when he had his first sexual experience. He recalled that it was with his first girlfriend, who was almost 15 years old. She was "my best friend's oldest sister". They were a couple when he was in 5th through 7th grades. He remembered, "Then 8th through senior year, (I) was with Tina - she was 13 (at the onset of their relationship)." They broke up when "I went to college". Mr. Karper said he began dating when he was in high school. He reported that he began masturbating at age 22, "when I decided that I didn't want any more". He said that he was first exposed to pornography when he was 3 or 4 years old, noting "some guy had it in his barn - found it in my bales - magazines". He shared that he taped sex once when he was with his girlfriend Jessica. From 2003 to 2004, he viewed pornography online, although he denied engaging in regular use.

Asked about prior mental health counseling, David Karper said he was in treatment "as a kid in Cobleskill". He recalled that he was in 4th or 5th grade, but "I couldn't trust anyone in charge

since the principal came after me with a curtain rod (in 3rd grade)." He added, "No one is in charge of me."

In an effort to find out about Mr. Karper's circle of friends and current support system, he was asked to talk about his platonic relationships. David Karper claimed that he has "too many friends". Asked who he is comfortable discussing personal problems with, he mentioned he neighbors, Mike, Ian, and his parents. To a question about who he talks to about the offense, he said "everybody". He also shared that he enjoys spending time with 95 percent of the neighborhood, noting "My father owns half of the town (the Town of Dorloo).

Asked if there was anything else he wanted to share for consideration in this evaluation, Mr. Karper said that he was "trying to catch my ex with my daughters pictures online". He claimed, "She tried to put our daughter in the internet - having sex herself or with other guys." He explained that he was told to look for her. He said, "Her grandmother told me about it", but he can't back up his claim because he can't get email (due to USPO restrictions). Mr. Karper stated, "(I) don't trust the police," as his explanation of why he did not report the suspected child abuse to legal authorities.

### *Psychological Testing of David Karper*

Mr. Karper was administered a battery of eight paper-and-pencil psychological tests, in order to better understand his social/emotional and psychosexual functioning. The tests used in this evaluation were as follows: the Psychological Screening Inventory (PSI), the Outcome Questionnaire (OQ), the Bumby Cognitive Distortion Scales for Rapists and Child Molesters, the UCLA Loneliness Scale - Revised Edition, the Buss Durkee Hostility Inventory, the Wilson Sex Fantasy Questionnaire, the Millon Clinical Multiaxial Inventory -III (MCMI-III), and the Minnesota Multiphasic Personality Inventory - Second Edition (MMPI-2). In addition, he was administered the Abel Assessment for Sexual Interests, which is a sophisticated computer-based test for ascertaining an individual's sexual preferences in a manner not based simply on self-report.

The Minnesota Multiphasic Personality Inventory - Second Edition (MMPI-2) is one of the most widely-accepted psychological tests available, and assesses not only psychological, emotional, and interpersonal functioning, but also assesses truthfulness and the client's willingness to be open about his strengths and short-comings. David Karper's scores on the MMPI-2 are considered invalid. His test response pattern indicates severe efforts to present himself in an unrealistically positive light. He denied having even common human faults to the point that test results may be invalid. His true level of problems is likely to be significantly more than what is described below. Mr. Karper depicted himself as overly virtuous, conforming, and self-controlled. His Lie Scale score (74th percentile) was well above the normal range.

The results of the MMPI-2 suggest the following about Mr. Karper with respect to his intellectual functioning. He portrayed himself as being mentally sharp, with average levels of subjective

cognitive efficiency. His thinking is goal directed and orderly. He does not report unusual thoughts or unusual sensory experiences. With respect to his emotional functioning, Mr. Karper reports average levels of depression. His true level of depression is in line with what he subjectively experiences. He also showed evidence of average levels of anxiety. He describes his current level of anger as being average, although his true level of anger is significantly more than what he subjectively experiences, with him being out of touch with underlying angry feelings. He is moderately irritable and easily angered. Angry feelings build, and result in periodic explosive aggression with poor awareness. His impulse control appears questionable, with this behavior generally being deliberate, except when he is under stress. Mr. Karper has the ability to think and plan before acting, although at times he may choose not to do so, especially when under stress.

With respect to his interpersonal functioning, the results of the MMPI-2 suggest that he is neither introverted nor extroverted. He experiences average levels of social discomfort and anxiety. He reports that his needs for attention are within the average range, as are his needs for affection, love, and intimacy. He wants to be independent, and has difficulty being dependent on others. Mr. Karper does not feel he is different from others; he feels well understood by other people. In general, he exhibits a stable sense of identity, and generally feels an above-average ability to cope with his world. He usually does not care what others think of him. However, he also exhibited some evidence of poor self-esteem, and he projects his own sense of feeling useless. However, he does not feel uncomfortable or unhappy with himself, and reports only average levels of guilt and regret.

David Karper was also administered the Millon Clinical Multiaxial Inventory (MCMI-III). The results of this test are illustrated in a computer-generated interpretive report. The results of the Interpretive Report from Mr. Karper include the following comments about his long-standing personality characteristics. However, it is important to note the first paragraph, which indicates that because Mr. Karper failed to provide honest and accurate answers to the questions asked of him, the results of the test must be viewed with much caution.

> Unless this patient is a well-functioning adult who is facing minor life stressors, his responses suggest an effort to present a socially acceptable appearance or a resistance to admitting personal shortcomings. Inclined to view psychological problems as a sign of emotional or moral weakness, the patient may protectively deny any unseemly traits or symptoms. This probably reflects either a broad-based concern about being appraised unfavorably by others or an active suspicion of the arcane motives of psychological inquiry. His MCMI-III scores have been adjusted to compensate for his defensiveness, but the overall profile may remain partially distorted. An interpretation based on standard interpretive procedures is likely to be reasonably valid but may fail to represent certain features of either the patient's current disorders or his character.

> The MCMI-III profile of this man often indicates a fear of public humiliation, a rigid compliance to social conventions and propriety, and an arrogant assumption that he

embodies the values of institutional authorities (e.g., church, business). A strong sense of duty to obey and follow others in leadership may typify his social relationships. Despite assumptions of being special, he may seek to maintain an image of being a considerate and cooperative person, one who is subservient yet ambitious. Often expressing feelings of high personal worth, he may downplay his attributes and abilities so as not to appear too egocentric. Condemnation and disapproval from others, however, greatly discomfort him, and he avoids criticism by appearing to be accommodating and overly respectful, especially with those in authority.

This man's efforts to appear proper and admirable lead him to seek institutions and persons with considerable power and control. By following their rules and guidelines, he hopes to hide the self-centered feelings that occasionally slip through his front of respectability and restraint. Fearing the exposure of these feelings and seeking to check them, he has had to learn to lead a life of propriety and disciplined self-control. Any form of self-assertion would endanger the security and respect he seeks. It is probable that this man lacks much insight into himself and others. Unless he receives clear guidance as to what is correct or proper, he may be quite indecisive and easily upset. Deviations from his routine may produce anxiety. However, this report may fail to disclose such difficulties because of his tendency to deny discordant emotions. He strongly desires to appear in a good light, and toward this end, he not only adheres to social conventions but is disinclined to admit any social shortcomings.

Furthermore, he dreads making mistakes or taking risks, lest they provoke disapproval and punishment. Contributing to these fears is a conscience that serves to counter his self-important urges and self-aggrandizing thoughts. As a consequence of constraining his feelings and rigidly denying emotional conflicts, he may have a history of psychosomatic complaints and functional symptoms.

David Karper was also administered a battery of self-report measures. Because his validity scale scores on the MMPI-2 and MCMI-III fell well above the normal range, there is inadequate support for the assumption that the information he provided on the following self-report measures is accurate. Therefore, this writer has engaged in only a limited interpretation of the findings of these self-report tests.

On the Psychological Screening Inventory, on four of the five subscales, David Karper' scores fell within the normal range. This suggests that, right now, he is not in need of residential psychiatric placement, nor does it appear that he is similar to a sample of incarcerated criminals. He does appear to be under more than an average degree of stress, and does not appear either introverted nor extroverted. Finally, his score on the Defensiveness scale (66th percentile) suggests that he did NOT respond candidly and honestly to the test questions, thereby causing these results to be invalid.

On the Bumby Cognitive Distortions Scales for Rapists and Child Molesters, the client is asked to identify the degree to which he agrees or disagrees with a number of statements which sex offenders have used to give themselves permission to commit sex offenses, or to justify their having committed the offenses. His moderate-range score on the Rape Scale (60) suggests that he does tend to experience some confusion about the nature and dynamics of rape, or hold beliefs which could be supportive of the rape of women. He had a relatively low score on the Child Molestation Scale (44). His scores on this test were in the low-moderate range, and suggest that he does not tend to hold many beliefs which might be supportive of child molestation, nor experience more than mild confusion about the nature and dynamics of child molestation.

On the Revised U.C.L.A. Loneliness Scale, David Karper's score (23) indicates that he portrayed himself as being exceptionally well supported by friends and family. Again, this may or may not be the case, in that he is providing an unrealistically positive portrayal of himself.

The Buss-Durkee Hostility Inventory is used to examine the manner in which the testee copes with feelings of anger and frustration. David Karper reported that he most often uses appropriate verbal strategies to cope with anger and frustration. However, he is also apt to use indirect (passive-aggressive) strategies to express his anger, or to voice his frustration to a supportive third party. He acknowledged that he also tends to make strong use of negativity, suspiciousness and assaultive behavior.

Finally, on the Outcome Questionnaire (O.Q. - 45.2), he reported that he is experiencing an exceptionally low level of discomfort, anxiety and tension, and that he has a few stressors which are currently causing him even a mild degree of difficulty. His highest rated item was: "I blame myself for things."

Mr. Karper also was administered two tests which focus specifically on his sexual interests. The Wilson Sex Fantasy Questionnaire asks the client to indicate the frequency at which he experiences various sexual fantasies. David Karper indicated that all of his sexual fantasies involve well-accepted sexual activities in which he engages within the context of an intimate relationship. He denied ever experiencing sexual fantasies about acts with "anonymous" partners, and reported experiencing no attraction about novel sexual experiences. He denied having sadomasochistic interests or fantasies, like whipping or spanking someone. He asserted that he "never" has sexual fantasies about having sex with someone much younger than himself.

David Karper was also administered an Abel Assessment for Sexual Interest (AASI), which is designed to provide information about the client's sexual preferences. This test contains both a questionnaire and a viewing time measure. On the questionnaire portion, David Karper denied that he has engaged in twenty of the twenty-one listed deviant sexual activities, including no use of adult pornography, no use of child pornography, and no use of adult Internet pornography. Curiously, he admitted that he has engaged in the molestation of a child. Specifically, he reported that he had engaged in the sexual abuse of children between the ages of 12 and 16 years of age. He acknowledged having had one victim, a teenage girl. He reported that this behavior

last occurred approximately 15 years ago. The victim was a neighbor or acquaintance. He acknowledged that he found teenage girls between 14 and 17 years of age to be sexually arousing.

On the Cognitive Distortion Scale, his score (44th percentile) suggests that he did not identify himself as holding beliefs supportive of child molestation. This score was in the "problematic" range. His Social Desirability score (75th percentile) was in the "highly problematic" range, which suggests that he does experience very significant difficulty in responding truthfully to questions about his sexual interests and activities.

On the viewing time portion of this test, the client's sexual interests are identified using a strategy other than his own self-report. On this viewing time test, David Karper was found to have one clinically significant area of sexual interest. He has a strong primary sexual interest in adult Caucasian women (3.19).

### Clinical Impressions and Recommendations

David Karper is a 30-year-old male resident of Cobleskill, New York. He has been arrested and charged with knowingly Receiving and Attempting to Receive Child Pornography. He pled guilty to this charge in September 2011, and is scheduled for sentencing in January 2012. Mr. Karper acknowledges that he was in possession of child pornography. He was referred for a specialized psychological evaluation by United States Probation Officer Dan Casullo. He was evaluated at Forensic Mental Health Associates in Albany on 11/1/11 and 11/8/11.

The psychological evaluation of David Karper was conducted in a manner consistent with the *Practice Standards and Guidelines for the Evaluation, Treatment and Management of Adult Male Sexual Abusers* (the Association for the Treatment of Sexual Abusers, 2005). Specifically, the evaluation included the following components: a review of background documentation, an individual interview of Mr. Karper, the administration of a battery of self-report and actuarial psychological tests, and the use of a viewing time measure designed to examine the nature of the client's sexual interests. The administration of a Psychophysiological Detection of Deception (polygraph) examination was deemed to be unnecessary to this evaluation, in that he has admitted to engaging in his offense behavior.

Throughout the evaluation process, David Karper maintained a guarded and oppositional stance. For example, on every psychological test which contained a scale reflecting deceptive responding, David Karper was found to have presented himself in an unrealistically positive manner, and to have denied even common human shortcomings. That is, he attempted to manipulate the results of the evaluation by presenting himself in a more virtuous and less troubled manner. This tendency is most evident in his explanation for why he was in possession of child pornography. Mr. Karper has a daughter who is now nine years old. He gave up custody of her when she was two weeks old, and has had no contact with her since that time. That is, he

has not attempted to provide her with child support, send Christmas presents, nor send her birthday cards. He explains that he was collecting child pornography because he heard, through a third-party with whom he has a minimal relationship, that someone had posted sexual pictures of his daughter on the Internet. He reported that he was looking through child pornography to try to find his daughter, and assured this writer that he would recognize her because he had seen a picture of her taken approximately two years ago. He engaged in a lengthy tirade against the federal law enforcement agencies for having thought that his "investigation" was a reflection of sexual interest in children. Instead, he argued that the federal agents had deviant and pedophilia interests, and were failing of their responsibility to investigate his allegations. (He acknowledged that he had not brought these allegations to the attention of the federal authorities, although placed little importance on this point.) He responded in a highly defensive manner when this evaluator challenged some of the weak points in his argument. By the end of the evaluation interview, David Karper still maintained that his illegal actions were appropriate.

David Karper presented an atypical personal history, in that he appears to have had a long-standing difficulty in complying with the expectations of authority figures. Throughout his educational history, he appears to have been subjected to disciplinary sanctions for various types of misbehavior. He was highly consistent in presenting himself as the victim in these altercations. That is, he was consistent in failing to take responsibility for his role in his various problems. For example, in his telling about an incident in which he and a friend stole a motorcycle, he claimed that he was arrested when he was returning it after having fixed it up. He tried to evoke a reaction of outrage from this evaluator by explaining that he was doing the right thing by returning the stolen motorcycle at the time he was arrested. He failed to appreciate the basic point that he was arrested because he stole the motorcycle. This tendency to minimize his own responsibility was exhibited very strongly in his explanation of the instant offense. He claims that he was conducting an investigation of his daughter, with whom he has had no contact for nine years. His account is simply ludicrous, yet he is aggressively indignant if one questions his explanation or motivation. This appears to be a long-standing, perhaps life-long tendency, highly consistent with diagnosis of Personality Disorder with antisocial and narcissistic features. It is going to be difficult to address successfully these problems in treatment.

The psychological testing had one curious finding. On the sophisticated psychological test for examining the nature of the client's sexual interests, the results indicated that he has a strong primary sexual interest only to adult Caucasian females. It did not find that he has a general sexual interest to prepubescent or post-puberty adolescent girls, as would have been expected by his selection of child pornography. This evaluator suggests that David Karper does have a pedophilia sexual interest, based on his having used specific search words in order to gather pornographic pictures of girls who were between six and nine years old. However, David Karper was not interested sexually in many of these girls, in that he was looking for pictures of "strawberry blonde" girls. Perhaps for this reason, he was not found to have a general sexual interest in prepubescent girls, in that he is interested only in blonde-haired girls in this age range.

In the opinion of this writer, David Karper poses at least a moderate degree of risk for sexual recidivism due to his highly guarded and defensive stance regarding his sexual offending. One might argue that many offenders maintain their denial through sentencing, in the hope that the judge will be convinced that they have not committed the offense for which they were convicted. Perhaps this is his rationale. However, this matter was discussed during the course of the evaluation, and Mr. Karper continued to maintain his noncompliant, defensive and belligerent attitude. Despite his cognitive and intellectual limitations, he was capable of reconsidering his stance, but chose not to do so.

Unfortunately, there are no sex offender risk prediction tools which have been developed for individuals convicted solely of possessing child pornography. David Karper exhibits several characteristics which suggests that he may be at elevated risk for engaging again in the use of child pornography. First, he continues to maintain that his behavior was appropriate, and that it is "the system" which has failed to recognize that he was behaving appropriately. Second, he fails to exhibit a stability in the community, as evidenced by his not having engaged in a stable romantic relationship, nor having created a stable vocational/employment history. Third, he appears to fail consistently to take responsibility for his inappropriate behavior, choosing instead to portray himself as "the victim." Each of these factors is associated with higher rates of sexual reoffending.

David Karper may be amenable to changing via specialized sex offender treatment, but such treatment will need to be of a rather intensive nature. He is not likely to do well in a correctional facility which offers only "breakout groups." He is not a viable candidate for community-based treatment at this time, in that he is not likely to be compliant with his Conditions of Probation (given his stance of seeing himself as a victim rather than offender).

Report submitted by:

*[signature]*

Richard M. Hamill, Ph.D.
Clinical Psychologist